IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL SHANE JONES                                  PLAINTIFF

v.                        Civil No. 06-2051

SHERIFF MIKE ALLEN,
Crawford County Detention Center;
LT. CUPP; CAPTAIN TERRY REA;
and CORPORAL LACY REED                         DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

       The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds pro se and in forma pauperis.

       Plaintiff is currently incarcerated in a unit of the Arkansas Department of Correction. The events at issue in this lawsuit occurred while the plaintiff was incarcerated at the Crawford County Detention Center. Specifically, plaintiff contends his constitutional rights were violated in the following ways: (1) he was denied an adequate diet; (2) his food was served in unsanitary conditions; and (3) he was denied access to newspapers or other media sources containing news coverage.

       Defendants filed a summary judgment motion (Doc. 32). To assist plaintiff in responding to the motion, a questionnaire was propounded (Doc. 36).

       Plaintiff filed a timely response to the questionnaire (Doc. 37). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

-1-

## Background

Jones was arrested and booked into the Crawford County Detention Center (CCDC) on March 16, 2006. *Plaintiff's Response* (Doc. 37)(*hereinafter Resp.*) at ¶ 1(A). He was charged with being a felon in possession of a firearm and possession of drug paraphernalia. *Id.* at ¶ 1(B). He was also being held on a parole revocation charge. *Id.* On March 29, 2006, he was sentenced to a term of six years in the Arkansas Department of Correction (ADC). *Id.* at ¶ 2. He remained incarcerated at the CCDC until he was transferred to the ADC on May 10, 2006. *Id.* at ¶ 18.

According to defendants, all inmates at the CCDC receive three meals a day. *Defendants' Exhibit* (*hereinafter Defts' Ex.*) B at ¶ 2. Jones, however, believes the meals were more like "snacks that fell below federal guidelines on nutrition and calories." *Resp.* at ¶ 3. He believes it would take all three meals served at the CCDC to make one nutritious meal. *Id.* He also asserts the amount served was not adequate. *Id.*

Although defendants indicate sedentary inmates were served a minimum daily calorie level of 2300 calories and active detainees a minimum daily calorie level of 2700 calories, *defts' ex.* B at ¶¶ 3-4 & *defts. ex.* C, Jones asserts all inmates were served the same meals, *resp.* at ¶ 6.

Mike Allen was the Sheriff of Crawford County during the time Jones was incarcerated at the CCDC. *Resp.* at ¶ 7. The policy of the CCDC requires the meals provided to detainees to contain the recommended dietary allowances and the basic four food groups. *Defts' Ex.* B at ¶ 5; *Defts' Ex.* C. The menus for meals at the CCDC are reviewed at least once a year by a registered or certified dietician for adequacy. *Defts' Ex.* B at ¶ 6; *Defts' Ex.* C.

AO72A
(Rev. 8/82)

The CCDC menus were reviewed on April 14, 2006, and found to "meet or exceed the USDA guidelines for the young adult male population." *Defts' Ex.* G. Jones states he has no knowledge regarding this. *Resp.* at ¶ 9(B). He also notes he is not a "young male" but a "grown male adult." *Id.*

Jones disagrees that the sample menus contained in defendants' exhibit H are typical of the meals he received while detained in the CCDC. *Resp.* at ¶ 9(C).

| **Defendants' Sample Breakfast**: | **Jones' Sample Breakfast**: |
|---|---|
| Oatmeal 12 oz. (w/butter & sugar) | Oatmeal 6 or 7 bits |
| Bread 2 slices | Bread 2 slices |
| Peanut Butter 2 oz. | Peanut Butter 1 scoop |
| Margarine 2 tsp. | |
| Milk 8 oz. | Milk 1 cup or 1 cup of Juice |
| Juice 8 oz. | |

| **Defendants' Sample Lunch & Supper**: | **Jones' Sample Lunch & Supper**: |
|---|---|
| Turkey Bologna 2 oz. | 2 paper thin slices of bologna |
| Bread 2 slices | Bread 2 slices |
| Carrots 8 pieces | Carrots-- 3 baby carrots |
| Pork & Beans 4 oz. | |
| Peaches 4 oz. | Peaches– 3 or 4 small |
| Orange Juice 8 oz. or | |
| Tea 8 oz. | Tea 1 cup |
| Mayo & Mustard 1 oz. | Mayo– 1 small scoop |

*Defts' Ex.* H at page 1; *Resp.* at ¶ 9(C).

Jones maintains the food was always served cold. *Resp.* at ¶ 10. He indicates defendants have no way of keeping the food at the proper temperature once it is on the trays. *Id.*

Jones ate his meals in his cell. *Resp.* at ¶ 12. According to defendants, wherever the food was served, the area was to be cleaned immediately afterwards and trash removed to an outside dumpster or garbage collection area. *Defts' Ex.* B at ¶ 9; *Defts' Ex.* C. Jones states the trays were removed from the cells but the cells were not cleaned afterwards. *Resp.* at ¶ 12. Furthermore,

-3-

while they ate, he indicates one of the inmates assigned to the cell would have to sit on the toilet. *Id.*

While he was at the CCDC, Jones states he was always hungry and thirsty. *Resp.* at ¶ 9(D). Jones also indicates he had trouble sleeping. *Id.* He asked the doctor about not being able to sleep and indicates he was told it was a result of coming off drugs. *Id.* However, since he has been at the ADC, Jones states he has been diagnosed with Type 2 Diabetes. *Id.* Jones maintains he is a diabetic "now due to not getting proper meals at CCDC." *Id.*

In the past, newspapers and magazines were provided to inmates at the CCDC. *Defts' Ex.* B at ¶ 10. However, defendants maintain that detainees were flushing these items down the toilets and causing plumbing problems. *Id.* For this reason, defendants maintain inmates were temporarily prohibited from reading newspapers and magazines. *Id.*

Jones asserts that during his incarceration at the CCDC he was not allowed to have newspapers or magazines. *Resp.* at ¶ 13 & ¶ 14. He did have access to other reading material. *Id.* at ¶ 14(B). Family members were allowed to bring fiction and non-fiction books to the inmates and there were about one hundred books in the library. *Id.* However, there was nothing having to do with news or the law. *Id.* If the deputies had time, the inmates were allowed to go to the library. *Id.* Inmates were allowed to have three books in their cells. *Id.* at ¶ 14(C). Inmates were also allowed to have three pair of underwear, two pencils, one towel, letters they have received, envelopes, stamps, three pairs of socks, three t-shirts, shampoo, one small bar of soap, one tube of toothpaste, one toothbrush, one deodorant, one Bible, one sheet, one blanket, paper, and one cup. *Id.*

In the past, defendants maintains television privileges were provided to inmates. *Defts' Ex.* B at ¶ 11. However, because of problems caused by inmates tapping into the electrical wires

of the television and trying to start fires, defendants assert inmates have been temporarily prohibited from viewing television. *Id.* Jones states that during his incarceration at the CCDC, no television has been available. *Resp.* at ¶ 15 & ¶ 16(A).

Defendants assert that inmates are allowed to listen to the radio for one hour each day. *Defts' Ex.* B at ¶ 12. Jones, however, asserts that during his first thirty days the radio was brought in only when everyone wanted to listen to it. *Resp.* at ¶ 16(B). If one person said no, the radio was not brought in. *Id.* When the radio was turned on, it was tuned to either a news talk show or Rush Limbaugh. *Id.* at ¶ 16(C). However, Jones states it was so noisy you could barely hear it. *Id.* Jones states he had no access to any source of information about local, state, national, or international news. *Id.* at ¶ 16(D).

Jones' basic human needs for food, clothing, shelter, medical care, and reasonable safety were met at the CCDC. *Resp.* at ¶ 17.

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient

evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment on Jones' claims. We will address each claim in turn.

### *Diet*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective

-6-

state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).

Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The Eighth Amendment's prohibition against cruel and unusual punishment requires prisoners to be provided with meals nutritionally adequate to maintain health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Constitution. Rather, the Constitution is only violated if the food provided is inadequate to maintain good health. *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food). *See also Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)(the deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities).

In this case, Jones contends the diet he received was inadequate. Specifically, he maintains he did not receive a sufficient amount of food and/or he did not receive a nutritionally adequate diet. As a result of the diet he received, he asserts he was always hungry and thirsty. *Resp.* at ¶ 9(D). He also contends that he was diagnosed with diabetes in June of 2006. *Id.* He

-7-

maintains this diagnosis was the result of not getting proper meals during his incarceration at the CCDC. *Id.*

Defendants have provided information establishing the menus they serve are reviewed at least once a year by a registered or certified dietician for adequacy. Moreover, they maintain the meals meet the recommended dietary allowance, provide a minimum daily calorie level of 2300 calories for sedentary detainees and 2700 calories for active detainees, and include food from the basic four food groups.

The menus of the CCDC were reviewed for nutritional adequacy on April 14, 2006. *See Defts' Ex.* G. Although Jones contends the menus were not always followed, when he was asked whether his basic human needs for food, clothing, shelter, medical care, and reasonable safety were met at the CCDC he responded that they were. *Resp.* at ¶ 17.

When he was asked if he had suffered any injury as a result of the diet he received, he responded that he was hungry and thirsty a lot and urinating frequently. *Id.* at ¶ 9(D). He also contends the diet he received caused his Type 2 diabetes. *Id.* According to the National Diabetes Information Clearinghouse, diabetes is a disorder of metabolism. http://www.diabetes.niddk.nih.gov/dm/pubs/overview#what (accessed August 20, 2007). "In people with diabetes, the pancreas either produces little or no insulin, or the cells do not respond appropriately to the insulin that is produced." *Id.* Symptoms of Type 2 diabetes include frequent urination, increased thirst and hunger. *Id.*

In short, there is nothing to indicate any of the alleged "injuries" Jones identified were attributable to the diet he received at the CCDC rather than to the medical condition he was diagnosed with a short time after he left the CCDC. We note Jones was incarcerated at the

AO72A
(Rev. 8/82)

CCDC from March 29, 2006, until May 10, 2006, and diagnosed with diabetes in June of 2006. *Resp.* at ¶ 2, ¶ 18 & ¶ 9(D).

While at the CCDC, Jones does not maintain he was lost weight or was unable to go about his activities of daily living because the alleged inadequacies in the diet. At this stage, Jones must do more than just make conclusory allegations. *See e.g., Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001)("Like any other civil litigant [a pro se litigant is] required to respond to defendants' motion with specific factual support for his claims to avoid summary judgment"). We find no genuine issues of material fact exist as to whether Jones was provided with an adequate diet.

### *Unsanitary Conditions*

Jones also asserts that the meals were served in unsanitary conditions. *Resp.* at ¶ 12. Specifically, he asserts he and two other inmates were served their meals in their cell. *Id*. He maintains one of the inmates had to sit on the toilet to eat. *Id*. Jones does not indicate why one of the inmates had to sit on the toilet as opposed to somewhere else in the cell.

The record does not support a finding that the food was prepared or served in unsanitary conditions. Jones has presented no evidence that the defendants were deliberately indifferent to the conditions in his cell or the fact that he sometimes, apparently, had to eat while sitting on his toilet. *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321, 2327, 115 L. Ed. 2d 271 (1991).

### *Access to Newspapers and/or Other News Media*

Jones maintains he never had access to newspapers, magazines, or television and did not have access to any source of information about local, state, national or international news. *Resp.* at ¶ 14(A), ¶ 15, ¶ 16(D). With respect to the radio, he states if anyone objected to the radio being played, it was not brought in. *Id.* at ¶ 16(C). If the radio was played, Jones states it was

-9-

tuned to a station playing a news talk show or Rush Limbaugh and it was so noisy in the pod you could barely hear it. *Id.* at ¶ 16(C).

Defendants acknowledge detainees have a right to receive news from outside sources while they are incarcerated. However, they maintain they have been forced because of legitimate penological interests to temporarily prohibit newspapers, magazines, and television. Instead, they maintain detainees are given access to news via the radio for one hour each day. Defendants assert substantial deference is due to their professional judgment as detention center administrators.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1972). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762, 92 S. Ct. 2576, 33 L. Ed. 2d 683 (1972).

Prison policies impinging on inmates' First Amendment rights are valid only if they are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999). "[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993).

In determining whether a regulation or restriction is reasonable, the court employs a balancing test considering: (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *See Beard v. Banks,* ___ U.S. ___, 126 S. Ct. 2572, 2575, 165 L. Ed. 2d 697 (2006)(applying *Turner* and upholding a Pennsylvania prison policy denying newspapers, magazines and photographs to a group of "specifically dangerous and recalcitrant inmates.").

It has been held that "[t]here is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights." *United States ex rel. Manicone v. Corso*, 365 F. Supp. 576, 577 (E.D. N.Y. 1973). Furthermore, a number of courts have held that prisoners have a right to receive and read newspapers. *See e.g, Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First Amendment right to receive and read newspapers); *Mann v. Smith*, 796 F.2d 79, 82-83 (5th Cir. 1986)(county jail's policy of banning newspapers and magazines violated a pretrial detainee's First Amendment rights where the state failed to show the ban served a legitimate government objective); *Wilkinson v. Skinner*, 462 F.2d 670, 673 n. 5 (2nd Cir. 1972)("refusal to deliver a newspaper would ordinarily be interference with appellant's first amendment rights"); *Rowland v. Jones*, 452 F.2d 1005 (8th Cir. 1971)(prison authorities' denial of access to newspaper "Muhammad Speaks" constituted prior restraint in violation of First Amendment); *Spellman v. Hopper*, 95 F. Supp. 2d 1267 (M.D. Ala. 1999)(absolute prohibition

-11-

on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological goals).

Here, defendants argue the ban on newspapers and magazines is rationally related to legitimate concerns because these materials were in the past used to cause plumbing problems when inmates flushed the items down the toilets. *Defts' Ex.* B at ¶ 10. With respect to televisions, defendants argue inmates tapped into the electrical wires and tried to start fires with them. *Id.* at ¶ 11.

According to Jones, inmates are permitted to have access to Bibles, books, towels, letters, envelopes, stamps, clothing, paper, sheets, blankets and numerous other materials. *Resp.* at ¶ 14(C). These items would appear to present the same security and safety concerns. In fact, "[c]ourts have recognized the tenuousness of the connection between [a prohibition on magazines and newspapers] and fire prevention." *Spellman*, 95 F. Supp. 2d at 1273. *See also Kincaid v. Rusk*, 670 F.2d 737, 744 (7th Cir. 1982)("[T]he total ban on newspapers was arbitrary and unjustifiable when the two hazards allegedly caused by the possession of newspapers--fire damage and jammed plumbing--could as well be caused by the sort of reading material detainees were permitted to have."); *Payne v. Whitmore*, 325 F. Supp. 1191, 1193 (N.D. Cal. 1971)("Jail cells are already filled with an abundance of materials quite suitable for fire starting . . . ; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on."). Here, defendants have submitted no supporting evidence concerning the frequency of fires or the effect banning newspapers had on the frequency of fires.

Courts have also recognized the tenuousness of the connection between a prohibition on magazines and newspapers and the prevention of floods or clogged plumbing. *See e.g., Mann*

*v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986)("inmates had sheets, blankets, pillows and clothing that could be used to interfere with the plumbing); *Kincaid*, 670 F.2d at 744 ("other paper and nonpaper material (*e.g.,* shoes) could just as easily jam toilets"); *Spellman*, 95 F. Supp. 2d at 1276 (the court would have difficulty finding a rational relationship between the prohibition on subscription magazines and newspapers and fire prevention and flood prevention); *Parnell v. Waldrep*, 511 F. Supp. 764, 767 (W.D. N.C. 1981)("no incidents of plugging toilets . . . occurred" after inmates were allowed to receive newspapers and magazines); *Payne*, 325 F. Supp. at 1193 ("Jail cells are already filled with an abundance of materials quite suitable for . . . drain clogging; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on.").

We believe there are genuine issues of material fact that preclude summary judgment in the defendants' favor on this claim. It is clear Jones was denied access to newspapers and magazines. While defendants have asserted a legitimate penological reason for denying inmates access to these materials, they allow inmates access to other materials that create the same hazards they seek to avoid by the ban. There is no explanation for this in the record.

Additionally, although Jones may have had some access to the radio, there are questions as to the frequency of this access, the quality of the access, and whether he even had access to state, local, national, and world news. Furthermore, there is some question as to whether the radio is considered a satisfactory alternative for newspapers and magazines. *See e.g., Jacklovich v. Simmons*, 392 F.3d 420, 431 (10th Cir. 2004)("Concerning the inmates' other alternative means to exercise their First Amendment rights, we agree that the ability to listen to the radio or

AO72A
(Rev. 8/82)

watch television is not an adequate substitute for reading newspapers and magazines.")(citations omitted).

### Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 32) be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to plaintiff's claims that he was provided an inadequate diet and his claim that his meals were served in an unsanitary environment. I further recommend that the motion be denied with respect to plaintiff's claim that his First Amendment rights were violated when he was denied access to newspapers or other media sources containing news coverage.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of August 2007.

/s/ *J. Marschewski*
  HON. JAMES R. MARSCHEWSKI
  UNITED STATES MAGISTRATE JUDGE